### LURIE et al. v. STECKEL.
#### No. 24428.

United States District Court
N. D. Ohio, E. D.

May 28, 1948.

724

James C. Davis, Frank Harrison and H. J. Crawford (of Squire, Sanders & Dempsey), all of Cleveland, Ohio, for plaintiffs.

Sidney Rigelhaupt, of Youngstown, Ohio, for defendant.

WILKIN, District Judge.

This case was submitted on stipulation, evidence, and argument. Jury was waived. It is an action for expenses and .fees for legal services. There was little dispute as to facts. The chief difference was regarding interpretations, inferences, duties and obligations arising from the facts. The ultimate difference as to amount to be paid was quite wide—the difference between nothing and three hundred thousand dollars.

There is no need to reiterate the facts and the arguments. But there are a few observations that may well be made at the outset. Neither side is justified in its extreme demands. In view of all the circumstances, the expenses advanced, the services rendered and accepted, it would be unconscionable and unjust to allow the plaintiffs nothing. On the other hand, in view of the circumstances, the relation of the parties, the correspondence, and professional con-

siderations, it would be wrong to allow the plaintiffs the amount they ask.

It is an unusual case. The defendant and his situation had presented very unusual problems. He was the inventor of a highly useful process of rolling steel.[1] He owned a minority interest in the company which held the patents covering that process. The patents were in litigation in many courts, and he was involved in extensive litigation with other stockholders over control of the company. His entire fortune was in his stock. His affairs were intensely complicated and his condition often seemed desperate. But if he could retain his stock holdings until the patents were sustained, his fortune would be secure.

It was with reference to his affairs other than the patent litigation that the plaintiffs represented the defendant. They continued their attention to his affairs for six years. The defendant had no available funds, so they extended credit. They advanced their own expenses and even advanced cash to their client (which he repaid). Most of the litigation in which they engaged was not successful if measured against the defendant's wishes and claims. But the plaintiffs now assert, not altogether without merit, that the efforts made in his behalf preserved his interests and prevented complete liquidation. The stock, which had no market value at the beginning of their service, attained a value of $4,000 a share at the termination, and the client, who had been almost destitute, finally held securities which were worth well in excess of a million dollars.

The defendant says the improvement in his financial condition was not because but in spite of his attorneys' efforts. He characterizes their services as worse than worthless. He attributes the improvement of his fortune to the recovery from the depression and the outcome of the patent litigation. The defendant further says that the plaintiffs refused to carry out his instructions and acted contrary to his wishes. As a result of differences and disputes he dismissed them as his counsel and forbade

[1] The typical inventor is usually fearful that the world is trying to steal his brain-child, and too often the facts seem to justify that fear. Yet complete loss of faith in humanity or a profession is not justified; there are honest, loyal people in all walks of life. Such loss of faith becomes a man's worst affliction because it makes assistance difficult if not impossible.

them to participate further in pending litigation (Exhibit D-1). He claims that thereafter they were representing their own interests, not his interests. The plaintiffs say that there was no justification for the order of dismissal and that the defendant was in no position to dismiss them because he could not pay them for expenses and services rendered. Furthermore they claim that he withdrew his dismissal and re-established the relationship of attorney and client and requested and accepted further services (Exhibit 17).

Another complaint of the defendant arises from his proffer of a certificate of participation in fifteen shares of his stock at a valuation of $4,000 a share, together with a dividend check on such stock, and the refusal of the plaintiffs to accept such proffer either in full payment or as payment on account. The defendant says that as a result of their refusal to accept such proffered payment his income tax for that year was materially increased. Because the proffer at that time was not cash or the equivalent of cash, it cannot be treated by the court as a tender. As a matter of law the plaintiffs had a right to decline the offer. Viewing the matter, however, in retrospect, it seems that it would have been best, both for the defendant and the plaintiffs, if they had accepted such offer. If the same relationship existed between plaintiffs and defendant at that time that had existed at the beginning of their dealings, such offer would have been accepted as payment on account.

■ ■ The claim of the plaintiffs is based largely on the hazard which they assumed. They assumed the representation of the defendant at a time when he was unable to pay, knowing that he would probably never be able to pay if the litigation regarding his patents failed to sustain his claims. It is true that the plaintiffs took a long chance. It is also true that their patience and devotion to the client's cause afterwards was remarkable. Not many men would be able to sustain their faith and confidence to such an extent and under such circumstances. The plaintiffs took a great risk on the gratitude and the generosity of their client. So far as that part of their risk is concerned, they lost. That loss is irretrievable. It is not the business of a court to be generous. The sole aim of a court is to be just. It therefore becomes the duty of this court to fix according to accepted standards the amount which the defendant should pay to the plaintiffs in view of all the facts and circumstances revealed by the stipulation, the evidence, and the correspondence, taking into account the age and experience of the plaintiffs, the time spent, the services rendered, the amount paid to other counsel for similar services, and the results.[2]

■ Beginning with the number of days charged as a basis for computation, we find a total of 1539¼ days—952½ in Boston and 536¾ in Ohio. Not all that time was devoted strictly to legal services. There was considerable time spent in peace efforts among directors, efforts to obtain financing, and numerous conferences. But there was also a vast amount of time spent by the plaintiffs and the more experienced trial counsel whom they retained, in trial work, briefing, and argument against formidable opposition. Most of the time spent in Ohio was by the youngest of the three Boston lawyers, and as to the time spent in Boston, it is quite probable that each day was not devoted exclusively to the defendant's affairs.

---

[2] Two experienced and reputable attorneys at the bar of this court testified that the services rendered were worth between $275,000 and $350,000. Their opinions were based largely upon the stipulation of facts, but they did not hear the testimony, which revealed all the circumstances and relations of the parties. The court of course gave serious consideration to such testimony, but it was conceded that it was merely advisory.* The defendant relied mainly upon his own testimony as to the value of the services and the testimony as to what other attorneys were paid for similar services. The Cleveland counsel who rendered services similar to those of the plaintiffs for a term of one year were paid about twenty thousand dollars. The defendant's Cleveland counsel rendered statements every three months and agreed with the defendant upon the value of such services. If the plaintiffs had adopted such a practice, this controversy might have been avoided.

* Campbell v. Green (5 CCA '40) 112 F.(2d) 143.

Other business was no doubt attended to. It seems to the court that a fair per diem allowance for an average of all the days would be $100. It is therefore the judgment of the court that the plaintiffs recover of the defendant the sum of $153,925 for services and $8738.07 for expenses, a total of $162,663.07.